## WRIGHT VS. MORRIS, AS AD.

W. and T. entered into a contract, some time in the month of January, that T. was to oversee for W. that year, at the rates of five hundred dollars per annum: HELD, That this was not a special contract for a definite time, and at a fixed price, the complete performance of which was a condition precedent to a right to compensation; and that the contract being performed though, in some respects, differently from the terms of the agreement, indebitatus assumpsit will lie for such compensation as the overseer is entitled to.

A contract, that the overseer shall not carry a horse, or dogs upon the plantation of his employer, and if he does, that he shall forfeit his wages: the penalty is waived by the employer, if upon the horses and dogs being carried there, he agrees to receive compensation for keeping the horse, and merely requests that the dogs be taken off, instead of promptly discharging the overseer.

A contract, under such employment, that the overseer shall make a "fair average crop," means that the crop should be a fair average one, making due allowance for the season and unforeseen events beyond the control of a prudent, faithful overseer; and not that the crop shall be an average one, at all events.

Upon ascertaining the compensation due, in such case, to the overseer, the jury may, in their discretion, allow interest.

*Appeal from the Circuit Court of Lafayette County.*

Hon. SHELTON WATSON, Circuit Judge.

WATKINS & CURRAN, for the appellant.

S. H. HEMPSTEAD, contra.

Mr. Justice WALKER delivered the opinion of the Court.

Joshua Morrison, the administrator of the estate of Thomas Trulove, deceased, brought his action in assumpsit, in the Lafayette Circuit Court, against Morehead Wright, charging him in a common indebitatus count for services rendered by Trulove, as overseer, for Wright.

From the evidence preserved upon the record in the bill of exceptions, the contract, under which the services were rendered, in the language of one, who was called to witness it, was, "That Trulove was to oversee for Wright that year, at the rates of five hundred dollars per annum. That Trulove was to make a fair average crop; and, if he failed to do this, he was to forfeit his wages. That he was not to carry dogs on the plantation of Wright that year, and if he did, that he should forfeit his wages. And also, that he would not carry a horse on the plantation, and if he did, that he should forfeit his wages.

It appears, from the evidence, that this contract was entered into some time during the month of January, 1844. Wright, not long after this, left the State on a visit, leaving his plantation to the management of Trulove, and did not return home until some time in October or November.

The season for making a crop is shown to have been unusually bad. That Wright's plantation is situated on Red River, and although better protected from overflow than most of the farms on the river, that about one hundred acres of it was overflowed in April or May. The crop, however, was re-planted by Trulove, and cultivated until some time after the crops were usually laid by. It was in evidence, also, that between 50 and 100 acres of the cotton crop were seriously injured by the worms.

In the opinion of some of the witnesses, the crop was not well tended. One witness, who formed his opinion from observations made as he passed by the plantation, thought the management

of the farm bad, observed that the fields were grassy, and thought the crop short or indifferent. Another witness, who was overseer on an adjoining plantation, stated, "that the year 1844 was a bad year for making a crop, and that he thought Trulove made as good a crop as his neighbors generally did. That crops were not, generally, good that year."

Other witnesses were examined, all of whom concurred in representing the season as unusually bad for making a crop, and that the crops were generally more indifferent that year than they usually were. There was also evidence that Trulove kept dogs and a horse on the farm, and hunted with them occasionally. That Wright was apprised of this, and agreed with Trulove to receive compensation for keeping the horse, and requested Trulove to send the dogs off, which he promised Wright he would do; and which, according to the statement of one of the witnesses, was done at the time agreed upon; but, by another, that the dogs remained until Wright discharged Trulove, which was soon after his return home, for the alleged cause that Trulove had broken his contract.

This is, in substance, the testimony upon the trial before the jury. Whereupon, the defendant moved the court to instruct the jury: "That if there was a special contract, the parties were bound by it, and that plaintiff could only recover by showing performance on his part, unless discharged by Wright without cause. That if Trulove violated his contract, he could not recover upon the contract, or otherwise."

Which instructions the court refused to give; but instructed, in effect, that if there was a contract, the plaintiff should sue upon it, and could not recover in indebitatus assumpsit. But that if the defendant dismissed Trulove before his term of service expired, no matter whether for sufficient cause or not, the plaintiff was entitled to recover for the work done; and that if the defendant was injured by the misconduct of Trulove, they might assess the damages for such injury, and deduct it from the amount

found to be due Trulove for his wages, even though it went to the whole amount thereof.

These instructions were, evidently, given under a misapprehension of the nature of the contract in this case. This was not a special contract for a definite time, and at a fixed price, the complete performance of which was a condition precedent to a right to compensation. It was a contract to oversee at the rates of $500, not for $500. There was no agreement as to the length of time Trulove was to oversee; and the terms, which fix the *rates*, instead of a definite sum to be paid, tend to show that there was no time definitely agreed upon. From the nature of Trulove's undertaking, it must necessarily have been intended that the engagement should continue until after the crop was made. The contract was, in fact, to make a fair average crop. Upon that, depended Trulove's right to any compensation whatever. When that was done, however, we apprehend that his right to demand compensation for his services at the rates agreed upon was perfect, and as it was not known, at the time of making the contract, how long it would take to make it, it may be fairly inferred, that it was for this reason that the *rates* alone were agreed upon. At all events, there is enough in the express agreement to repel the idea that the services were intended to continue for a year. For if it had been the understanding, it is presumed that they would have so expressed it, in terms equally easy to express, and more significant of the real contract.

Under this view of the case, it becomes unnecessary to discuss the very intricate and doubtful questions, which arise upon special executory contracts, for the performance of labor, where the performance of the entire service is a condition precedent to the right to recover the sum agreed to be paid upon its performance. What acts or circumstances will amount to an excuse for the non-performance of such conditions, or whether under any, or what circumstances, the party contracting to perform a condition precedent, may abandon his contract, and sue in *indebitatus assumpsit* for the value of the services rendered under the contract and in

part performance thereof, we are not now called upon to decide, and in regard to which there are conflicting opinions by jurists of distinguished ability. Thus, the Supreme Courts of New York, Massachusetts, Alabama, and several others, where the contract is entire and executory, hold that it must be declared upon; be- cause, whilst in force, the parties are bound by it, and there is no ground for implying a promise upon which a recovery may be had in indebitatus assumpsit. *Stark vs. Parker*, 2 *Pick.* 275; *Roberts vs. Brownrigg*, 9 *Ala.* 108; *Ladue vs. Seymor*, 24 *Wend.* 60.

Opposed to these decisions, is the decision of the Supreme Court of New Hampshire, in the case of *Britton vs. Turner*, 6 *New Hamp. Rep.* 481, in which it is held that, even in case a special contract should be voluntarily abandoned by the party, whose duty it was to perform services, which were a condition precedent to his right to compensation under the contract, yet still, if the party contracted with actually receives such services (although performed under, and in part performance of, such special contract), and thereby derives a benefit and advantage, over and above the damages, which have resulted from the breach of the contract by the other party, the labor actually done, and the value received, furnish a new consideration; and the law thereupon, raises a promise to pay, to the extent of the reasonable worth of such excess; for the recovery of which an action may be sustained; not upon the contract, but in indebitatus assumpsit. It may also be remarked, that South Carolina and Mississippi would seem to favor the rule laid down in the case of *Britton vs. Turner*, when the contract is made with overseers for their ser- vices; but the opinions of the courts in these States, are mainly predicated upon a custom or common understanding prevailing there in regard to overseers' wages. 6 *S. & M. Rep.* 639; 4 *McCord* 246.

The state of case before us, may be considered as coming more properly under the rule in regard to *executed*, than executory contracts. Which is, that when the contract has been fully per-

formed, according to its terms, and in some cases where it has been performed, but, in some respects, differently from the terms of the agreement, as nothing further remains to be done, under the contract, on the part of the party thus performing it, a duty is raised, for which a general indebitatus assumpsit will lie. 1 *Watts & Serg.* 304; 4 *Blackf.* 493; 4 *Cow.* 566.

Under these authorities, there can be no objection to the form of the action in this case, if the facts entitle the plaintiff to recover. The question then is, was this contract executed? Did Trulove make for Wright a fair average crop? If he did, he was entitled to recover the value of his services, rendered for the time he was employed, at the rates agreed upon. If not, he was, by his express agreement, entitled to no compensation whatever. There is certainly no illegality in the contract itself which forbids its enforcement.

The agreement, relating to the dogs and horse, when considered in connection with the testimony in regard to Trulove's habits, was evidently intended to remove from him temptations to misspend his time in hunting, for which he is said, by the witnesses, to be passionately fond. Thus understood, these are minor considerations, but in any event, if, as appears in evidence, Wright agreed to receive from Trulove a compensation for keeping the horse, or upon finding the dogs there, instead of promptly discharging Trulove for a breach of contract, requested him to take them off the plantation, which Trulove agreed to do, and as, according to the testimony of one witness, was done, such acts amounted to a waiver of all objection to Trulove's conduct in that respect. If it had been Wright's intention to claim the penalty for the violation of his contract, it was his duty, at once, to have discharged Trulove, and not to have permited him to perform services upon the faith of payment under the contract.

We come now to consider the main question in the case, the making an average crop. And first: How shall we understand the terms "fair average crop?" We cannot believe, that the crop should be such, at all events, and notwithstanding the occurrence of events unusual in their occurrence, and over which the over-

57BB

seer could have no control, even with the most skilful and faithful conduct on his part: for this would have amounted to an express warranty, at all events. The negroes, the teams, and the farm were committed to the care and control of the overseer, for the purpose of making the crop, and as well might it be supposed, that there was a warranty against cholera, that might have swept off every negro from the farm, as against unusual overflows: and yet, had the cholera visited the plantation and caused the death of the slaves, so as to prevent the cultivation of the crop, it could scarcely be said the overseer, who had demeaned himself well, should receive no compensation for his services, or that he ever intended, when contracting, to warrant a fair average crop under such circumstances. And, for the very same reason, he would not contract against overflow, or an extraordinarily bad season. But the obvious meaning of the parties must have been that the crop should be a fair average crop, making due allowance for the season, and unforeseen events, beyond the control of a prudent, faithful overseer.

Whether Trulove did this or not, was a question of fact, to be determined by the jury: and the extraordinary season, and like circumstances before them in evidence, as well as the crop raised, and the conduct and deportment of Trulove, should be considered in determining the question. And, when so considered, if they should find that Trulove did make a fair average crop, the plaintiff was entitled to a verdict for the value of his services for the time he was employed. If not, then, under his contract, he was entitled to nothing. It is unnecessary to discuss the questions, which would arise in case Wright had turned Trulove off, before the crop was made, as the evidence clearly shows a different state of case.

Under this view of the case, it is evident that the Circuit Court correctly refused to give the instructions moved by the defendant; and that, although the court erred in the instruction given to the jury, inasmuch as the verdict is such as the jury might well have found, under the evidence, had proper instructions been

given, it is evident that, if we were to reverse the judgment, and remand the case with instructions to grant a new trial, under proper instructions, the same verdict, under the evidence, might be sustained. The motion for new trial presented this question broadly before the court below, and the rule, as repeatedly held by this court, is that, although there may be error in the ruling of the court, upon some question of law, yet still, if such decision (although erroneous) did not tend to withhold material facts from their consideration, and if the verdict was correct in view of the whole case, and such as might have been rendered under proper instructions, it is not error, in the Circuit Court, to refuse to grant a new trial.

The only other question is, whether the damages are excessive. It is true, that the amount of the verdict exceeds the amount due the plaintiff's intestate for his services, for the time he was engaged at overseeing, at the rates agreed upon. But, allowing the plaintiff interest from the time the work was completed, which (under the statute, *Digest, ch. 90, sec. 1,* if they believed that there had been vexatious delay) they might in their discretion do, the verdict will be found to be less than might have been found. And that the jury did allow interest, in this case, there can be no doubt, upon comparing the amount of the verdict with the amount of the services rendered and the interest thereon.

Upon consideration of the whole case, we are of opinion that the Circuit Court did not err in refusing to grant a new trial. Judgment affirmed.